**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| SCOTT HENDRIXSON, on behalf of himself and as next friend of his minor child, **BKH**, Plaintiff, | Case No. |
| vs | Hon. |
| MURFREESBORO, TENNESSEE, JOSHUA HINKLE, ERIC BARBEE, RUTHERFORD COUNTY, TENNESSEE, and BRADLEY HARWELL, Defendants | **JURY DEMAND** |

**COMPLAINT**

**JURISDICTION AND VENUE**

1.  This action is brought by Plaintiff pursuant to 42 U.S.C. § 1983 to redress the violation by Defendants of Plaintiff's rights secured by the Fourth and Fourteenth Amendments to the United States Constitution.

2.  This Court has jurisdiction under 28 U.S.C. § 1331 to hear Plaintiff's claims arising under the Constitution and laws of the United States and under 28 U.S.C. § 1343 to hear Plaintiff's claims to recover damages and to secure equitable relief under any Act of Congress providing for the protection of civil rights.

3.  This Court also has supplemental jurisdiction to hear state law claims under 28 U.S.C. § 1367 as any such state law claims are so related to federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

4.  This Court also has diversity jurisdiction to hear state law claims under 28 U.S.C. § 1332

1

because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states.

5.     Venue is appropriate in the Middle District of Tennessee under 28 U.S.C. § 1391(b)(2) as this is the judicial district in which a substantial part of the events or omissions giving rise to this claim occurred.

## PARTIES

6.     Plaintiff is a resident of Katy, Texas and identifies as Caucasian. Plaintiff's spouse is African American. Together, they are the parents of BKH, a minor female, who has darker skin color than her father but lighter skin color than her mother.

7.     Plaintiff BKH sues through her father and guardian pursuant to F.R.C.P. 17(c)(1)(A). Alternatively, BKH may sue through her father acting as her Next Friend pursuant to F.R.C.P. 17(c)(2). BKH identifies as biracial.

8.     Defendant Murfreesboro, Tennessee, is a municipal corporation of the State of Tennessee and operates a police department.

9.     Defendant Rutherford County, Tennessee, is a political subdivision of the State of Tennessee and operates a law enforcement department, including a K-9 unit.

10.     Defendant Joshua Hinkle was, at all times relevant to this complaint, a police officer of the City of Murfreesboro and remains employed by the City of Murfreesboro and who was, at all times, acting under color of law. Hinkle is also a Field Training Officer (FTO) within the Murfreesboro Police Department and claims to have a "skill set" that supports the City of Murfreesboro trusting him to train other people. Hinkle is sued in his individual capacity.

11.     Defendant Eric Barbee was, at all times relevant to this complaint, a police officer of the

2

City of Murfreesboro and remains employed by the City of Murfreesboro and who was, at all times, acting under color of law. Barbee had come to Tennessee from the Sacramento, California, police department only a few months before the incidents described in this complaint. Barbee is sued in his individual capacity.

12. Defendant Bradley Harwell was, at all times relevant to this complaint, a deputy of the Rutherford County Sheriff's Department and part of its K-9 unit. Harwell remains employed by the Rutherford County Sheriff's Department and was, at all times, acting under color of law. Harwell is sued in his individual capacity.

**GENERAL ALLEGATIONS**

13. On or about June 26, 2023, at approximately 12:30 in the afternoon, Scott Hendrixson ("Plaintiff") was traveling back to his home in Katy, Texas, with his minor daughter, BKH, from visiting his parents in McMinnville, Tennessee. The chosen route took them into Murfreesboro via Highway 70S in the Westerly direction. Highway 70S is also known as Dr. Martin Luther King Jr. Blvd.

14. Plaintiff was driving his grey Hyundai four-door sedan, registered to him, and bearing a Texas license plate which was admittedly attached by only one screw that caused it to hang at a less than horizontal position.

15. The Texas license plate number was registered to Plaintiff's car and identified Plaintiff as the registered owner of that car.

16. At the intersection of Dr. Martin Luther King Jr. Blvd. and Minerva Dr., still headed West, Plaintiff was stopped at a red light when Defendant Hinkle, driving a marked Murfreesboro Police Department vehicle, stopped behind him. Hinkle had been parked on the side of Highway 70S earlier and entered the roadway after Plaintiff had passed his

3

position.

17.   Defendant Hinkle followed Plaintiff after the light turned green for approximately 25
      seconds at which point he activated his vehicle's blue lights. Plaintiff immediately pulled
      to the left in a paved section of the divided highway that allowed him access to the
      residential street of South Baird Lane. Plaintiff then came to a complete stop before the
      first home's driveway on the right side of the road and Defendant Hinkle pulled in behind
      him.

18.   Defendant Hinkle stepped out of his patrol car and approached Plaintiff at the driver's
      side window, which Plaintiff had rolled down, and identified himself (in very fast
      speech). Hinkle explained, "Just a little thing about your plate, uh, your plate back here is
      about to fall off." Plaintiff responded that he had to "get back home" and take care of it
      and then stated that home was in Texas but he was visiting his parents in McMinnville.
      Hinkle then asked for identification which Plaintiff immediately provided.

19.   Hinkle then asked if they had flown in which Plaintiff clearly explained they had driven
      in. Hinkle asked about a piece of luggage in the back seat that still had a flight tag on it.

20.   Plaintiff clearly says, "That's her luggage. That's luggage we brought with us." When
      Hinkle asked "just an old flight tag, then?", he clearly responded, "Oh, yeah, she keeps
      her flight tags on her bags, probably got some from Disney World." Hinkle then asks,
      "who's this to you?" and Plaintiff clearly responds "that's my daughter, [using the first
      name of BKH]."

21.   Hinkle then asks for proof of insurance and vehicle registration and asks "how long have
      you guys been up here for?" Plaintiff responded, "We've been since… Sunday. We left,
      no, actually we left Monday last week and got here on Tuesday." Plaintiff then explained

4

the route he took, through Louisiana, and said it was about 800 miles.

22. Hinkle then asked if Plaintiff had any "guns, bombs, grenades in the car, nothing like that." Plaintiff clearly explained that he had a 20-gauge shotgun that "doesn't have anything in it" (meaning unloaded) in the trunk of the car that was his from childhood and that his dad had bought him.

23. Hinkle continued to ask questions like, why Plaintiff had moved to Texas and other questions about Plaintiff's "life story." Plaintiff clearly and calmly answered all his questions.

24. Hinkle said he was going to write a warning ticket and returned to his patrol car without getting Plaintiff's car registration document and started running Plaintiff's information on his patrol car laptop computer.

25. Defendant Barbee arrived approximately three minutes later after hearing on the radio that Hinkle was in a traffic stop and he was in the area. Barbee approached Hinkle's vehicle, Hinkle stopped what he was doing on the vehicle laptop, and Barbee and Hinkle engaged in a conversation which was transcribed from Hinkle's in-car camera as follows (with timestamps):

> 00:07:28 Hinkle
> So, obviously, 55-4-110, right? You got to be securely fastened.
>
> 00:07:33 Barbee
> Yep.
>
> 00:07:34 Hinkle
> They're coming from McMinnville. Drove here from Texas. They've got luggage with flight tags on it in the back. And that -- they brought only one little suitcase with them to be there for a week at his parents' house.
>
> 00:07:49 Barbee
> Huh. Interesting.

5

00:07:50 Hinkle
And now they're drive -- They're going to go driving back, but not today.
Coming out to Murfreesboro for something.

00:07:57 Barbee
He didn't say what, huh?

00:07:59 Hinkle
So -- and his – quote-unquote -- daughter in the passenger seat was the
whole time I was behind her, like, got up in her seat to look around and
look behind us. And, so, -- and his wife's name is Tina, and unless that
daughter is adopted or Tina is Hispanic she's – the girl in there looks
really Hispanic.

00:08:34 Barbee
Running, running her around?

00:08:36 Hinkle
Maybe, I don't know. So, we're gonna – he's --- And he's just like all over
the place giving out a bunch of information – Says he's got a shotgun in
the trunk. But, so that his parents – something from his parents from a
long time ago. Little bit of nervousness there…

00:09:02 Barbee
Nothing in plain view? Is the car pretty clean?

00:09:03 Hinkle
No, no. And I mean the car's got like junk in it, like he's got a pillow, it's
got -- looks like it's got like a blanket. But what's throwing me off is that I
asked about flying up here. And he's goes "no". And then I was like, "OK,
then what's up with the tags with the luggage on it or the luggage with the
tags on it?" He goes, "Oh it's all, you know, that's our luggage that we
brought up here with us." And if you go up there and look, you can see
that it's just one little suitcase for two people. Now he might have
something in the trunk, but … I was like "OK, you know, you know,
whatever." Blah, blah, blah. You know, he might -- she might have
something on it, you know, says from Disney World. But, there's a lot of
stuff. It's kind of making me interested about it, especially when she got
up and turned around and looked at us.

00:09:50 Barbee
Yeah.

00:09:50 Hinkle

6

And then immediately, like on the road, like we're going down MLK stopped immediately and then pulled off into the center turn lane.

00:10:00 Barbee
I don't know why people do that.

00:10:02 Hinkle
So, I might -- might try to push it a little bit and see what we got and then -

00:10:05 Barbee
Yeah, absolutely --

00:10:09 Hinkle
See what's happening with it real quick. As long as you're down for it.

00:10:15 Barbee
Always.

00:10:16 Hinkle
[Boisterous laughter]

26.    Hinkle's and Barbee's discussion about "running her around" was a reference to possible child sex trafficking and implied that BKH was a child prostitute and Plaintiff must be her pimp and was based solely on Hinkle's comment that "Tina" [said with an incredulous tone] must either be Hispanic or that BKH must be adopted because BKH looked Hispanic and therefore Plaintiff could not possibly be her father because he was White.

27.    Many of the statements Hinkle made to Barbee as support for wanting to "push it a little bit" are demonstrably untrue.

   a.    "They've got luggage with flight tags on it in the back."

      i.    There was one luggage in the left rear seat but it only had one old flight tag on it, not "flight tags" [plural].

   b.    "… they brought only one little suitcase with them to be there for a week at his

7

parents' house."

        i.       There was no evidence that Plaintiff and his daughter had brought only one little suitcase with them to be at Plaintiff's parents' house for a week. In fact, there was another suitcase in the trunk of the car but Hinkle never asked if there were any other suitcases.

c.      "… They're going to go driving back, but not today. Coming out to Murfreesboro for something."

        i.       There was no evidence nor did Plaintiff ever say that they were driving back "but not today".

        ii.      There was also no evidence nor did Plaintiff ever say that they were "coming out to Murfreesboro for something."

d.      "So -- and his – quote-unquote -- daughter in the passenger seat was the whole time I was behind her, like, got up in her seat to look around and look behind us."

        i.       According to the dashcam video, BKH never "got up in her seat", never "look[ed] around" and never even "look[ed] behind" at his patrol car.

        ii.      The sarcastic use of "quote-unquote" by Hinkle referencing Plaintiff's statement that BKH was his daughter was based solely on the difference of skin color between Plaintiff and BKH.

e.      "And he's just like all over the place giving out a bunch of information – Says he's got a shotgun in the trunk. But, so that his parents – something from his parents from a long time ago. Little bit of nervousness there…"

        i.       Plaintiff was not "all over the place".

        ii.      Plaintiff was not "giving out a bunch of information" but instead was

8

answering all of Hinkle's questions, even intrusive questions, to the best
of his ability.

     iii.    Plaintiff clearly explained that the shotgun was from his childhood that his
father had purchased for him and only because Hinkle asked him if he had
any firearms.

     iv.    Plaintiff showed absolutely no signs of nervousness whatsoever.

f.    "I asked about flying up here. And he's goes 'no'."

     i.    Plaintiff clearly says, "I'm sorry? No, we drove, we drove."

g.    "And then I was like, 'OK, then what's up with the tags with the luggage on it or
the luggage with the tags on it?' He goes, 'Oh it's all, you know, that's our
luggage that we brought up here with us.'"

     i.    Plaintiff never said it was "our luggage". When asked about the tags on
the luggage in the back seat, Plaintiff responded, "That's her luggage.
That's luggage we brought with us."

     ii.    When Hinkle asked "just an old flight tag, then?", Plaintiff clearly
responded, "Oh, yeah, she keeps her flight tags on her bags, probably got
some from Disney World."

h.    "… you can see that it's just one little suitcase for two people."

     i.    There was no evidence and Plaintiff never said that the one piece of
luggage in the back seat was for both of them.

i.    "Now he might have something in the trunk, but …"

     i.    Hinkle never asked if there was more luggage in the trunk. Had he asked,
Plaintiff would have told him that his luggage was in the trunk.

9

      ii.     In fact, during the search of Plaintiff's trunk, Barbee removed and searched the luggage that had Plaintiff's belongings in it. Even though the suspicion based on there being "one little suitcase for two people" had now been demonstrably refuted, Hinkle and Barbee continued their search of the car and its contents.

   j.    It's kind of making me interested about it, especially when she got up and turned around and looked at us."

      i.     According to the dashcam video, BKH never "got up and turned around and looked" as Hinkle indicated with his police lights for Plaintiff to pull over.

28. Hinkle then exited his patrol vehicle, approached Plaintiff again, and instructed him to step out of his vehicle and to follow him to the front of his patrol car. Barbee then approached the passenger side window where BKH was seated with her window still rolled up.

29. Barbee took his cellphone and took a photo of the inside of the car from the rear, passenger side window and a second photo through the sunroof.

30. Barbee waived to BKH, still with her window rolled up, and BKH calmly waived back. At no time did BKH give any indication that she was a child prostitute or a victim of sex trafficking.

31. By at least this point in time, Plaintiff was detained well beyond the time necessary to complete the task of writing a warning ticket for an improperly secured license plate, thereafter necessitating Hinkle and Barbee to have some evidence of another crime afoot or having been committed to justify the extended detention.

10

32.     Barbee then signaled to BKH to roll down her window, which she did. They engaged in conversation where BKH told Barbee that home was in Texas and that Plaintiff was her father. BKH's answers were consistent with Plaintiff's statements to Hinkle. At no time did BKH give any indication that she was a child prostitute or a victim of sex trafficking. BKH's confirmation of these facts further refuted any basis for further detention.

33.     Barbee then asked BKH where the "rest of your all's luggage at" and BKH answered "in the trunk." This effectively refuted Hinkle's basis for being suspicious that there was only one piece of luggage for the both of them. Yet, Barbee cooperated with the continued detention and later participated in a search of the car.

34.     After Hinkle had stopped the process of checking Plaintiff's information and writing a warning ticket, as he said he would do, he called fellow Murfreesboro Police K-9 officer Blake Troutman to come do a search of the air around the car.

35.     According to an MPD Internal Affairs Investigative Report, Hinkle explained to Officer Troutman the basis for his suspicion as "the driver seemed nervous", which was untrue, and "had given a changing story about when he had arrived in Tennessee", which was also untrue, and that he "only had only one visible bag in the vehicle", which was an incomplete fact as Plaintiff had another bag in the trunk.

36.     Officer Troutman, however, was unavailable and advised Hinkle to call Rutherford County Sheriff Department for use of one of their K-9 units.

37.     Hinkle then called Rutherford County Sheriff's Department to provide a K-9 unit.

38.     Hinkle continued to question Plaintiff as a delay tactic to give a K-9 officer sufficient time to arrive. The K-9 officer did not arrive on the scene until 30 minutes after the initial stop for an improper license plate, far longer that it would normally take to write out a

warning ticket.

39. Hinkle and Barbee, aside from the difference between Plaintiff's skin color and BKH's skin color and that they were on their way home to Texas from visiting Plaintiff's parents in McMinnville, had absolutely no evidence of any crime.

40. Hinkle's comment that Plaintiff's wife "Tina" had to be Hispanic or that BKH must be adopted was a reference to BKH's darker skin color in contrast to Plaintiff's white skin.

41. Hinkle then asked Plaintiff if he would have an "issue with me searching your car" but did not explain why he wanted to search. Plaintiff refused consent unless Hinkle could provide him with a valid reason.

42. Hinkle explained that it was because he and Barbee regularly work that area and "know what comes out of, you know, that way" meaning John Bragg Highway, which is the main corridor between Woodbury and Murfreesboro. "A lot of meth and stuff", Hinkle explained.

43. Beyond the road taken by Plaintiff from McMinnville to Murfreesboro, which is the same road taken by thousands of people every day, Hinkle did not give Plaintiff any other reason for his wanting Plaintiff to consent to a search.

44. Hinkle then told Plaintiff to stand by his patrol car while Hinkle purportedly completed writing out his warning ticket. Hinkle returned to his patrol car, started texting someone on his cell phone, and deliberately turned off his bodycam microphone.

45. Thirty minutes after the initial detention of Plaintiff, Hinkle exited his vehicle and approached Rutherford County Sheriff's K-9 Deputy Bradley Harwell and his Belgian Malinois K-9 "Tiko" who had just arrived and parked behind Barbee's patrol car.

46. Deputy Harwell and Hinkle engaged in conversation but Hinkle's bodycam audio was

still muted. However, the timestamp on Hinkle's bodycam shows that the entire conversation lasted approximately 55 seconds. Harwell listened but did not appear to ask any questions.

47.     According to an MPD Internal Affairs report, Deputy Harwell was interviewed and stated that "Officer Hinkle explained that Mr. Hendrixson was showing indicators of deception and asked him to run his K-9 partner, Tiko, around the vehicle." This was untrue as Plaintiff did not show any indications of "deception" nor would such even justify further detention or reasonable suspicion or probable cause for a search. No other facts in support of probable cause for a search was provided by Hinkle according to the reported interview of Harwell.

48.     According to MPD policy, when a K-9 handler is asked to respond, the handler "will ultimately decide if a K-9 search is justified and or conducted."

49.     Based on the bare information given to Harwell by Hinkle, a K-9 search, and further detention to perform the search, was not justified.

50.     Barbee then instructed BKH to put her shoes on and step out of the vehicle and stand by Hinkle's patrol vehicle where "Dad" was standing. This reference to "Dad" by Barbee confirmed that, by that point in time, Barbee believed that Plaintiff really was the father of BKH as he had claimed. Yet, he continued cooperating with the detention, gave instructions to Plaintiff and BKH about where to stand during the K-9 search, and participated in the search of the car.

51.     Harwell then told everyone to move further away from Plaintiff's car while his K-9 performed a search.

52.     Fifteen minutes after Hinkle deliberately muted his bodycam microphone, he turned it

back on while explaining to Plaintiff that they were going to perform a search of his vehicle.

53. K-9 "Tiko" was led around Plaintiff's car by Harwell and gave no indications until he climbed up on the passenger side front door and stuck his nose inside. This was where pizza and other food could be detected by "Tiko". Tiko appeared to smell the food.

54. Harwell then returned to Hinkle and informed him that "Tiko" had a "positive detection" to the passenger window but not the driver window but did not say what Tiko had detected nor what Tiko was trained to detect. Harwell then put Tiko back in his patrol vehicle and walked over to where Plaintiff was standing in front of Hinkle's car. Although he could have used Tiko to further assist in the search of the car by Hinkle and Barbee, he did not.

55. Hinkle then informed Plaintiff that, with the "dog alerting, we now have probable cause to search the car."

56. As Hinkle put on white gloves and began his search, he again deliberately muted his bodycam microphone.

57. During the search, Hinkle handled the luggage located in the back set of the car and closely inspected the flight tag and would have seen that the flight tag was old. The contents of the luggage would also have clearly indicated that it belonged to a teenage girl. Yet, he continued the search.

58. Approximately 5 minutes into the search, Barbee, who was searching the right front passenger compartment where "Tiko" had supposedly given a "positive indication", began to question the reliability of that indication. According to his bodycam (which unlike Hinkle's was not muted) at 00:30:03, Barbee, showing frustration at not finding

14

anything illegal, says, "Seems like, even the tiniest spec that – the dog would've tripped on, but…." A minute later, Barbee, at 00:31:23, says, "yeah, man, I don't know. I got nothing over here." Thirty seconds later, Barbee walks to the driver's side where Hinkle was still searching and says, "I'm good with that side, man." Barbee found nothing illegal nor anything that would have explained the dog's positive indication other than food.

59. Yet, Hinkle and Barbee continued their search of the interior of the car and then the trunk and the engine compartment (where the car engine had been running the entire time) despite the fact that the K-9 had never alerted to the trunk or the engine compartment.

60. As Hinkle and Barbee huddled over the trunk of the car, Hinkle showed frustration at also not finding anything illegal. "Nothing else to fuck with…", Hinkle said, according to Barbee's bodycam at 00:37:47. Barbee agreed.

61. According to Barbee's bodycam at 00:39:35, after the search was completed and nothing was found, Plaintiff asked "what was the suspicion based on that you could search my car?" When Hinkle claimed it was because the dog "hit on the car", Plaintiff clarified that his question was related to calling the dog for a search after he declined consent to search.

62. Hinkle commenced a rambling, disjointed, fast-talking, reply that, in part, explained the following:

> So, here's the deal. We have that right to do that, right? We have to have reasonable articulable suspicion and I have that, right? From the – and it might have just been the fact that you misstated. We had, um, we had, from what I could see in the vehicle at the time, right, it was a small bag - a small, little bag, right, for a two-person team to be up here, two-person unit to be up here one little bag like that for a whole week's worth of stuff – doesn't make sense to me, ok? When we see trafficking – when we see drug trafficking – here, ok? That's typically what MO, they'll fly up here, get a car, rent a car. So, I didn't run your tag until I already got you stopped, right? So, for all I know, that's a rental car. What they'll

15

do is they'll fly up here, they'll rent a car, and then drive it back to their home place, right? And they'll use kids, too. They will – they'll go, oh, I'm just traveling with my daughter or my son or my cousin or my nephew or whatever, and we're taking them back home. We see that a lot, ok? We have all those, ok? And then you're telling me when you got in that you're going home, got in... Now, you're going home. Oh, we left Monday, got in Tuesday. The fact that you might have misspoke makes me think that you're story isn't cohesive with everybody else going on. … You asked for my suspicion and that was my suspicion, ok? Based on my training and experience and the stuff that I have seen and done here in this police department a lot fits the mold… It's nothing. I'm making sure that there's nothing. That's my whole thing. That's my whole reason why I'm on a specialized unit, that's why I have a stripe, because I've taught myself pretty well and now they trust me to teach other people. I have enough skill set to realize that something's not right. And all we need per the United States Supreme Court is reasonable suspicion. … [spitting chewing tobacco on the street]. I don't know you from anybody. I don't know her from anybody. For all I know you're the King Pin down in Katy, Texas. [Being from out of town] is part of it. That's not all of it – that's part of it. Ok. I see – we see tags from Ohio, we see tags from Vermont, we see tags from all this other stuff, California, we see it all, right? And they're all rentals. 90 percent of them are rentals. And we see a lot of drug trafficking, too, right? [Brags about a prior drug bust.]

63.   Hinkle conveniently left out his earlier comments to Barbee about suspecting BKH was a child prostitute being trafficked by Plaintiff based on the color of her skin and her perceived ethnicity.

64.   When Plaintiff (who had a hard time getting in any words because Hinkle would interrupt and speak over him) pointed out that Hinkle would have known his car was not a rental when he showed him his insurance, Hinkle admitted that the car being a rental was not a factor he had at the time he called for a drug dog. "But there were other indicators" he claimed. Barbee interjected and agreed "based on our training and experience it's possible that something's here."

65.   Barbee then cited to "United States v Rodriguez", claiming that the case allowed them to do what they did.

66.   Approximately 22 minutes after Hinkle muted his bodycam microphone for the second

time, he turned it back on as he was explaining the warning tickets to Plaintiff and exclaimed that "I'm not an asshole -- or butthole, sorry" in front of his teenage daughter.

67. Neither Hinkle or Barbee ever found anything illegal in the car nor did they find any evidence of child sex trafficking.

68. After Plaintiff returned to Texas, he ordered the bodycam videos and in-car camera videos related to this encounter from Murfreesboro PD. Plaintiff also filed a complaint with Murfreesboro PD after he reviewed the videos and realized that the race of his daughter was a factor in their detention.

69. On July 28, 2023, Murfreesboro PD Sergeant Sean Garrison drafted a memorandum to Murfreesboro PD Chief Michael Bowen regarding Plaintiff's complaint. In that report, Sergeant Garrison reviewed Murfreesboro Police Department policies and noted that, while guidelines are in place to "prevent bias-based policing" and the City does not condone the practice, the City would also "take the necessary actions to protect its officers from unwarranted accusations…"

70. General Order No. 368 states that "If an officer develops reasonable suspicion that narcotics are present, and time and conditions permit, an officer may request the use of a K-9 unit. Mere refusal of consent does not justify a K-9 search." Also, when "requested to respond, the K-9 handler will ultimately decide if a K-9 search is justified and or conducted."

71. Sergeant Garrison concluded that there "was clearly articulated reasonable suspicion that led Officer Hinkle to investigate further, and a K-9 alert provided probable cause for a search of the vehicle. Nothing indicated that the race or perceived race of the occupants was a factor in his decision to stop the vehicle or to further his investigation."

17

72.    Although Sgt. Garrison claimed to have reviewed the bodycam videos, this conclusion
completely ignored Hinkle's comments about BKH's race and appearance to Barbee as a
factor in wanting to "push it a little bit and see what we got" and extend the detention.
Nor does this conclusion explain why the traffic stop for a hanging license plate was
extended to give a K-9 unit time to arrive based solely on the route taken into
Murfreesboro, that is, John Bragg Highway, as stated by Hinkle to Plaintiff on Barbee's
bodycam video.

73.    The only "facts" provided by Sgt. Garrison in his report supporting his conclusion that
there was reasonable suspicion were:

> While obtaining Mr. Hendrixson's information and discussing where he was
> coming from and going, Officer Hinkle became suspicious that further criminal
> activity may have been afoot. Mr. Hendrixson was from Texas and gave
> conflicting dates as to when he had arrived in Tennessee. Officer Hinkle noticed a
> single carry-on-sized piece of luggage in the back seat of the vehicle with an
> airline tag on it, although there were two people in the vehicle. Officer Hinkle
> also thought the route through the middle of Murfreesboro seemed odd for a
> return trip to Texas from McMinnville.

74.    Sgt. Garrison's report does not say what "further criminal activity" was "afoot". A review
of Hinkle's bodycam video, however, clearly shows that Plaintiff did not give
"conflicting dates as to when he had arrived in Tennessee".

75.    A review of Hinkle's bodycam video also clearly shows that Plaintiff told Hinkle that the
luggage in the back seat was his daughter's and the airline tag was old. A review of
Barbee's bodycam video also clearly shows that BKH told Barbee that other luggage was
in the trunk of the car and confirmed that Plaintiff was her father.

76.    A review of Hinkle's and Barbee's bodycam video also clearly shows that the "route
through middle of Murfreesboro" for a return trip to Texas from McMinnville as "odd"

18

was never mentioned by either Hinkle or Barbee as a basis for their suspicion. A simple Google Map search for routes from McMinnville, Tennessee, to Katy, Texas shows the shortest route going right through Murfreesboro on Highway 70S, the very route that Plaintiff was travelling when he was stopped.

77. Sgt. Garrison's report states that Hinkle and Barbee "located a shotgun in the trunk as well as prescription ADHD medication belonging to Mr. Hendrixson." But there was nothing illegal about the shotgun and the ADHD medication (dextroamphetamine, generic Adderall) was found in the trunk, not the passenger side front area where the K-9 had supposedly alerted. In fact, the K-9 never alerted to the trunk area despite passing by it multiple times.

78. Sgt. Garrison's report states that Hinkle starting "issuing warning citations" at 12:41:58 on the clock stamp of Hinkle's bodycam and Rutherford County Deputy Harwell arrived over 10 minutes later.

79. It does not take over 10 minutes to write out a warning ticket especially considering that Hinkle had started writing it out before Barbee even arrived on the scene and purposefully delayed completing it to give Harwell time to arrive.

80. Sgt. Garrison's report states that Harwell advised Hinkle that his K-9 "alerted on the passenger window for the presence of narcotics." But Hinkle's bodycam shows that Harwell never mentioned the word "narcotics" and merely stated that his dog had given a "positive detection" and "positive indication" but he did not say to what nor did Harwell mention what his K-9 was even trained to detect.

81. Sgt Garrison's report states that Barbee was interviewed. According to Barbee, when he arrived on the scene Hinkle "explained to him that the driver's answers regarding where

19

he was coming from and going and the timeline made him suspicious." Barbee also said that Hinkle "told him that the driver had possibly flown in from Texas and was driving back, but there was only one small bag in the back seat with an airline tag, and there were two people in the vehicle."

    a.    This version of what Hinkle said to justify extending Plaintiff's detention was untrue and incomplete as can easily be shown on Hinkle's and Barbee's bodycams.

    b.    Hinkle never said anything about what Plaintiff had said about where he was coming from and going. Hinkle's and Barbee's bodycam both clearly show that Hinkle said "They're coming from McMinnville. Drove here from Texas."

    c.    Hinkle never said a word about a "timeline".

    d.    Hinkle also never told Barbee that Plaintiff "had possibly flown in from Texas". Indeed, such an explanation would make no sense since Plaintiff was driving a car registered and owned in his own name with valid Texas plates and a valid Texas driver's license.

    e.    While it is true that there was "only one small bag in the back seat with an airline tag", Hinkle clearly told Barbee that "you can see that it's just one little suitcase for two people. Now he [Plaintiff] might have something in the trunk…"

82.    Barbee deliberately omitted from his interview statement that he (Barbee) and Hinkle had discussed the idea that BKH was being "run[] around" by Plaintiff (meaning sex trafficked) based on her appearing Hispanic, as can clearly be seen and heard on both Hinkle's and Barbee's bodycam video.

83.    Sgt. Garrison's report states that he interviewed Hinkle. According to the report, Hinkle

said that, as he pulled behind Plaintiff's vehicle, "he noticed a Hispanic female turn all the way around and look at him. Hinkle claimed that Plaintiff changed his answers about when he had come to Tennessee and when he was leaving and that Plaintiff "seemed nervous" and stated he had a shotgun in the trunk. Hinkle also claimed the route "coming through the middle of Murfreesboro on a route from McMinnville to Texas seemed odd to him." No other explanation justifying extending the detention was given.

84.    Hinkle never disclosed to Sgt. Garrison that he had suggested to Barbee that BKH must either be adopted or have a Hispanic mother based on her appearance and that this was a basis for him thinking she was being sex trafficked.

85.    Hinkle never told Barbee on the scene that the route taken to Texas by Plaintiff was "odd" to him.

86.    Other parts of Hinkle's interview statements are demonstrably untrue according to bodycam video.

       a.    The only basis for Hinkle to describe BKH as "Hispanic" was the color of her skin. No one ever claimed that she was Hispanic and neither Hinkle or Barbee ever asked.

       b.    BKH never turned all the way around and looked at him. But even if she had, this is not suspicious activity and it is quite normal for people to turn and look when being pulled over by police.

       c.    Plaintiff never "changed" his answers. Rather, when he initially said he had left Texas on a "Sunday", he quickly corrected himself and clarified that it was a "Monday" and they arrived in McMinnville on a Tuesday.

       d.    Plaintiff never said anything about when they were leaving.

e.    Plaintiff never appeared nervous.

f.    Plaintiff answered that he had a childhood shotgun in the trunk that was unloaded after Hinkle asked him if he had any firearms. This fact was not indicative of any criminal activity.

g.    There was nothing "odd" about the route from McMinnville to Texas through Murfreesboro. A simple Google Maps search shows the shortest route to be through Murfreesboro on Highway 70S, the exact route taken by Plaintiff when he was stopped.

87.    Sgt. Garrison's report also says Hinkle told him that the K-9 conducted a "free air sniff around the vehicle." This is demonstrably untrue as the dashcam video clearly shows the K-9 climbing up on the passenger side door and sticking his nose into the interior of the car (where food was located).

88.    Sgt. Garrison's report says that MPD K-9 Officer Blake Troutman was interviewed. Troutman reported that Hinkle spoke to him by phone where Hinkle "explained the reasonable suspicion that led him to request a K-9 unit. Officer Hinkle told him the driver seemed nervous and had given a changing story about when he had arrived in Tennessee, and he only had one visible bag in the vehicle.

89.    These statements are demonstrably untrue according to bodycam videos.

a.    Plaintiff never appeared nervous.

b.    Plaintiff never gave a "changing story about when he had arrived in Tennessee."

90.    Despite how the "changing stories" factor was demonstrably untrue according to bodycam videos, Sgt. Garrison concluded that Hinkle has "clearly articulated reasonable suspicion that led [him] to investigate further, and a K-9 alert provided probable cause for

a search of the vehicle. Nothing indicated that the race or perceived race of the occupants was a factor in his decision to stop the vehicle or to further his investigation" even though the bodycam videos clearly show Hinkle mentioning the race/ethnicity of BKH as a factor supporting his desire to inquire further and extend the traffic stop.

91.    Hinkle was found to have violated policy regarding the use of chewing tobacco, turning off his bodycam microphone, and using "curse words".

92.    On July 31, 2023, Craig Tindall, the City Manager for the City of Murfreesboro and its highest ranked executive officer, emailed Plaintiff and said:

> Mr. Hendrixson: I have reviewed your several emails. I have also reviewed the videos of this traffic stop and MPD's internal review of the complaint you filed against the Officer involved. Based on complete information regarding this matter, I find nothing that warrants further action. Officer Hinkle acted professionally at all times. His decisions and law enforcement actions were substantiated, appropriately, and properly conducted. I consider this matter closed.
>
> I returned your phone call last week and left a message, but I have not received any follow up phone call. I am happy to speak with you about this matter if you desire. I do not believe, however, there is any additional information that will change the City's position.

93.    In the end, Plaintiff's detention lasted over one hour before he was released and free to go.

94.    The entire car cam video from Hinkle's patrol car can be viewed at

https://www.youtube.com/watch?v=UryyEqiwy6Y&t=4s.

95.    A video showing a zoomed-in focus on Plaintiff's car from Hinkle's car cam showing that BKH never turned around as Hinkle claimed can be viewed at

https://www.youtube.com/watch?v=KbjR3dEET20.

96.    The entire bodycam video from Barbee can be viewed at

https://www.youtube.com/watch?v=d-vqiS9GCKc.

97.     The entire bodycam video from Hinkle (partly muted deliberately by Hinkle) can be

        viewed at https://www.youtube.com/watch?v=Sh6TAWRlctI&t=197s.

## COUNT I

### (42 U.S.C. § 1983 - City of Murfreesboro)

98.     Defendant City of Murfreesboro developed and maintained policies or customs exhibiting

        deliberate indifference to the constitutional rights of persons who came in contact with

        City of Murfreesboro police officers, all of which caused the violation of Plaintiff's

        rights.

99.     It was the policy and custom of the Murfreesboro Police Department to allow officers to

        use race or perceived ethnic origin to detain drivers and prolong a traffic stop detention

        beyond the time necessary to complete the traffic stop.

100.    It was the policy and custom of City of Murfreesboro Police Department to inadequately

        supervise and train its subordinates, including Defendants Hinkle and Barbee, thereby

        failing to adequately discourage further constitutional violations on the part of its

        officers.

101.    It was and is the policy, practice and custom of City of Murfreesboro, through its

        principal policy makers and decision makers, to inadequately and improperly investigate

        practices of detention without reasonable suspicion and/or probable cause, including

        detention based on race as a factor, and acts of misconduct were instead tolerated and

        ratified by Defendant.

102.    As a result of the above-described policies, practices and customs, Defendants Hinkle and

        Barbee believed their actions would not subject them to possible punishment by their

24

employer, City of Murfreesboro, and that misconduct would not be properly investigated or sanctioned, but would instead be tolerated and ratified.

103. The above described policies, practices and customs demonstrated a deliberate indifference on the part of policymakers of City of Murfreesboro to the constitutional rights of persons within city limits, specifically their rights under the 4th and 14th Amendments to the U.S. Constitution against unreasonable seizure, unjustly prolonged detention, and unreasonable search, and were the cause of the violations of Plaintiff's rights alleged in this complaint.

104. The official authorization and pervasive pattern of the above challenged conduct, evidenced in part by the lack of disciplinary action against Defendants Hinkle and Barbee, shows a likelihood of recurrence that is objectively unreasonable.

105. As a direct and proximate cause of Defendant's acts as alleged, Plaintiff, on behalf of himself and as next friend to BKH, suffered damages, including embarrassment, frustration, humiliation and/or nominal damages.

**COUNT II**

(42 U.S.C. § 1983 – Joshua Hinkle)

106. Defendant, under color of law, violated the Plaintiff's constitutional rights as guaranteed by the 4th and 14th Amendments to the U.S. Constitution by detaining the plaintiff and his minor daughter beyond the time necessary to complete the process of drafting a warning ticket without further reasonable suspicion or probable cause and by intentionally using race or perceived ethnicity as a factor for further detention.

107. Race and/or Hispanic appearance, especially one based on the color of skin, is of such little probative value that it may never be considered a relevant factor where

25

particularized or individualized suspicion is required.

108.  As a direct and proximate cause of Defendant's acts as alleged, Plaintiff, on behalf of
himself and as next friend to BKH, suffered damages, including embarrassment,
frustration, humiliation and/or nominal damages.

**COUNT III**

(42 U.S.C. § 1983 – Eric Barbee)

109.  Defendant, under color of law, violated the Plaintiff's constitutional rights as guaranteed
by the 4th and 14th Amendments to the U.S. Constitution by detaining the plaintiff and his
minor daughter beyond the time necessary to complete the process of drafting a warning
ticket without further reasonable suspicion or probable cause and by intentionally using
race or perceived ethnicity as a factor for further detention.

110.  Race and/or Hispanic appearance, especially one based on the color of skin, is of such
little probative value that it may never be considered a relevant factor where
particularized or individualized suspicion is required.

111.  As a direct and proximate cause of Defendant's acts as alleged, Plaintiff, on behalf of
himself and as next friend to BKH, suffered damages, including embarrassment,
frustration, humiliation and/or nominal damages.

**COUNT IV**

(T.C.A. 8-8-302 – Rutherford County, Tennessee)

112.  Defendant Harwell was a deputy appointed by the Sheriff of Rutherford County,
Tennessee, at the time of his actions and was within the scope of his employment and
was acting by virtue of or under color of the office.

113.  Deputy Harwell lacked independent reasonable suspicion and/or probable cause to

26

conduct a search using his K-9 "Tiko" and the facts provided to him by Defendant Hinkle did not support an independent finding of reasonable suspicion and/or probable cause.

114.    As a direct and proximate cause of Harwell's acts as alleged, Plaintiff, on behalf of himself and as next friend to BKH, suffered damages, including embarrassment, frustration, humiliation and/or nominal damages.

115.    Defendant Rutherford County is liable for Harwell's actions as described herein and under each count pursuant to T.C.A. 8-8-302.

**COUNT V**

(42 U.S.C. § 1983 – Bradley Harwell)

116.    Defendant, under color of law, violated the Plaintiff's constitutional rights as guaranteed by the 4th and 14th Amendments to the U.S. Constitution by detaining the plaintiff and his minor daughter beyond the time necessary to complete the process of Hinkle drafting a warning ticket without further reasonable suspicion or probable cause.

117.    Defendant lacked independent reasonable suspicion and/or probable cause to conduct a search using his K-9 "Tiko" and the facts provided to him by Defendant Hinkle did not support an independent finding of reasonable suspicion and/or probable cause.

118.    As a direct and proximate cause of Defendant's acts as alleged, Plaintiff, on behalf of himself and as next friend to BKH, suffered damages, including embarrassment, frustration, humiliation and/or nominal damages.

**COUNT VI**

(False Imprisonment - Joshua Hinkle)

119.    Defendant Hinkle restrained, confined, and/or detained Plaintiff and his minor daughter, BKH, against their will.

27

120. The restraint, confinement, and/or detention was such that Plaintiff and his minor daughter were compelled to stay against their will.

121. The restraint, confinement, and/or detention was unlawful in that it lacked reasonable suspicion or probable cause.

122. The detention constitutes the intentional tort of false imprisonment under Tennessee law.

123. As a direct and proximate cause of Defendant's acts as alleged, Plaintiff, on behalf of himself and as next friend to BKH, suffered damages, including embarrassment, frustration, humiliation and/or nominal damages.

**COUNT VII**

(False Imprisonment - Eric Barbee)

124. Defendant Barbee restrained, confined, and/or detained Plaintiff and his minor daughter, BKH, against their will.

125. The restraint, confinement, and/or detention was such that Plaintiff and his minor daughter were compelled to stay against their will.

126. The restraint, confinement, and/or detention was unlawful in that it lacked reasonable suspicion or probable cause.

127. The detention constitutes the intentional tort of false imprisonment under Tennessee law.

128. As a direct and proximate cause of Defendant's acts as alleged, Plaintiff, on behalf of himself and as next friend to BKH, suffered damages, including embarrassment, frustration, humiliation and/or nominal damages.

28

## COUNT VIII

### (False Imprisonment - Bradley Harwell)

129.    Defendant Harwell restrained, confined, and/or detained Plaintiff and his minor daughter,

BKH, against their will.

130.    The restraint, confinement, and/or detention was such that Plaintiff and his minor

daughter were compelled to stay against their will.

131.    The restraint, confinement, and/or detention was unlawful in that it lacked reasonable

suspicion or probable cause.

132.    The detention constitutes the intentional tort of false imprisonment under Tennessee law.

133.    As a direct and proximate cause of Defendant's acts as alleged, Plaintiff, on behalf of

himself and as next friend to BKH, suffered damages, including embarrassment,

frustration, humiliation and/or nominal damages.

### PRAYER FOR RELIEF

Plaintiff requests that the Court award the following:

1.    Judgment against the individually named defendants for all damages, including any

nominal damages, for violation of Plaintiff's Constitutional rights;

2.    Judgment against Defendants City of Murfreesboro, Tennessee, and Rutherford County,

Tennessee, for all damages, including any nominal damages;

3.    Injunctive relief in the form of an order compelling the City of Murfreesboro police

department to undergo training on the Fourth and Fourteenth Amendments and on the

prohibition against use of race or perceived ethnicity in supporting extending a traffic

stop;

4.    Injunctive relief in the form of an order compelling the County of Rutherford Sheriff's

29

Deputies to undergo training on the Fourth and Fourteenth Amendments and on the requirement to ascertain facts that independently establish reasonable suspicion and/or probable cause for a K-9 search after a traffic stop;

5.     A jury to try this case;

6.     Reasonable attorney's fees pursuant to 42 U.S.C. § 1988 or any other law allowing for recovery of attorney fees;

7.     Cost of suit and such other and further relief as the court deems just and proper.

                                    Respectfully submitted,

                                    /s/ Jerry Gonzalez
                                    Jerry Gonzalez (18379)
                                    Attorney for Plaintiff
                                    8000 Hwy 99, #456
                                    Rockvale TN 37153
                                    615-360-6060
                                    jgonzalez@jglaw.net

30